## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

JOSEPH J. MAYER
dba HCC CONTRACTORS
NICOLE D. MAYER
fka NICOLE D. VINCIL

Case No. 3:20-bk-31861-SHB
Chapter 7

Debtors

UPPER CUMBERLAND ISLAMIC SOCIETY

Plaintiff

v.

Adv. Proc. No. 21-ap-3003-SHB

JOSEPH J. MAYER

Defendant

## M E M O R A N D U M

**APPEARANCES:**    HODGES, DOUGHTY & CARSON, PLLC
Jason L. Rogers, Esq.
James F. Parker, Esq.
Post Office Box 869
Knoxville, Tennessee  37901
Attorneys for Plaintiff

LAW OFFICES OF MAYER & NEWTON
John P. Newton, Jr., Esq.
8351 E. Walker Springs Lane
Suite 100
Knoxville, Tennessee  37923
Attorneys for Defendant

**SUZANNE H. BAUKNIGHT**
**UNITED STATES BANKRUPTCY JUDGE**

After Defendant failed to complete a construction project for Plaintiff and then filed for

Chapter 7 bankruptcy protection, Plaintiff initiated this adversary proceeding to seek a

nondischargeable judgment for damages allegedly caused by Defendant's failure to properly

perform under the parties' contract and to object to Defendant's Chapter 7 discharge.  The

Complaint to Determine Dischargeability of Debt and Denial of Discharge ("Complaint") was

filed timely on February 1, 2021, raising claims under 11 U.S.C. § 523(a)(2)(A), (a)(4), and/or

(a)(6) and 11 U.S.C. § 727(a)(3). [Doc. 1.]  Defendant answered by denying Plaintiff's

allegations and asserting that Plaintiff is not entitled to any relief. [Doc. 13.]

The trial of this adversary proceeding was held over four days in November 2021 and

January 2022.[1]  The trial record consists of the Stipulation of Undisputed Facts included in the

Joint Pre-Trial Statement filed on November 9, 2021 [Doc. 41]; seventy-four exhibits entered

into evidence; and the testimony of five witnesses:  Dr. Ali Alouani ("Dr. Alouani"), Dr. Wali

Kharif ("Dr. Kharif"), Almod Soliman ("Mr. Soliman"), Debtor Nicole Mayer ("Ms. Mayer"),

and Defendant.[2]  According to the Joint Pre-Trial Statement, the issues before the Court are (1)

whether Plaintiff is entitled to a nondischargeable judgment against Defendant and, if so, the

amount, and (2) whether Defendant should be denied his discharge under 11 U.S.C. § 727(a)(3).[3]

---

[1] This is a core proceeding under 28 U.S.C. § 157(b)(I) and (J), and the parties have expressly consented to entry of a final judgment and orders by the bankruptcy court even if it is determined in a later proceeding that these matters are not core.

[2] The Court also takes judicial notice, pursuant to Federal Rule of Evidence 201, of all documents of record in Defendant's underlying bankruptcy case.  References to documents from Defendant's bankruptcy case will be [Bankr. Doc. ___].

[3] As directed by the Court at the close of trial, Plaintiff filed Proposed Findings of Fact and Proposed Conclusions of Law on March 21, 2022 [Docs. 63, 64].  On April 29, 2022, Defendant filed his Proposed Findings of Fact, and his Proposed Conclusions of Law [Docs. 73, 74].  Defendant also filed a Response to Plaintiff's Proposed Findings of Fact [Doc. 72], and Plaintiff filed a Reply to Defendant's Proposed Findings of Fact on May 13, 2022 [Doc. 76].  The parties also filed, as directed by the Court, post-trial briefs on March 21, 2022, and April 29, 2022, respectively [Docs. 65, 75].  Additionally, notwithstanding its failure to request permission from the Court to do so, Plaintiff filed a reply brief on May 13, 2022 [Doc. 77].

# I. FINDINGS OF FACT

## A. The Parties

Plaintiff is a Tennessee not-for-profit corporation that promotes and supports the Muslim community in the Upper Cumberland region of Tennessee, with its principal office in Cookeville, Tennessee. Plaintiff is administered by an executive board that includes volunteers and other constitutional members who serve as officers (the "Board"). Both constitutional and volunteer members of the Board have voting privileges over administration of and decision-making for Plaintiff. At the time of trial, Dr. Kharif[4] was a member of the Board, serving as its Secretary, Treasurer, and Registered Agent, and Dr. Alouani[5] was a volunteer member of the Board but not an officer.

In approximately 2009, Plaintiff purchased real property at 323 North Walnut Avenue, Cookeville, Tennessee (the "Site"), intending to build a mosque and community center to attract talent to the area and Tennessee Technological University and to establish a dialogue with the community (the "Project"). Plaintiff received approval for its architectural design, conducted fundraising, and commenced a geotechnical engineering study.

Dr. Alouani was designated by the Board as the point-of-contact for the Project, and he was authorized to find a general contractor for the proposed construction. Plaintiff hired Mr. Soliman as its owner's representative for the Project. Mr. Soliman had many years' experience as an architectural designer and, before 2018, had owned a construction company. He was involved in preparation of the design documents for the Project, including working with the city engineer on modifications beginning almost two years before ground-breaking.

---

[4] Dr. Kharif has a Ph.D. in history and is a retired professor from Tennessee Technological University.

[5] At the time of the trial, Dr. Alouani, who has a Ph.D. in electrical engineering and is a professor at Tennessee Technological University, had served on the Board for more than fifteen years.

In June 2018, Plaintiff received the geotech report from GEOServices, LLC ("GEOS Report") that revealed potential issues concerning subsurface soil suitability (i.e., soft soil) and water issues that would require performance of significant below-grade work to develop the Site. Dr. Alouani testified that the Board understood that based on the GEOS Report results, Plaintiff could not build a structure on the Site unless the soil and water issues were resolved first.

Defendant began his career in the construction industry by working as a tile subcontractor in the 1990s before obtaining his general contractor's license in 2006. To meet the State of Tennessee's requirement for assets sufficient to support the requested monetary limits for his license, Defendant identified "HCC Contractors" as a partnership on the licensure applications with the Tennessee Board for Licensing Contractors. The first iteration of the licensing application for HCC Contractors identified Defendant's father-in-law, Donald Batho, as a partner. The second iteration identified a business associate, Michael Nesmith, as a partner. Defendant, however, admitted that neither Mr. Batho nor Mr. Nesmith was ever an actual partner of HCC Contractors. The original $350,000.00 monetary limit for the contractor license issued to HCC Contractors, ID #59352, increased in 2014 to $600,000.00, and each subsequent renewal obtained by Defendant with the State of Tennessee indicated that there were no changes to the underlying partnership or assets thereof.[6] Although Defendant continuously represented to the State of Tennessee that he was a general partner of HCC Contractors, he identified HCC Contractors as a sole proprietorship in his Voluntary Petition and on his tax returns. [*See* Bankr. Doc. 1 at p. 2.]

The majority of Defendant's experience as a general contractor consisted of renovation work on existing structures. He testified that he lacked significant experience with projects

---

[6] Defendant testified that HCC Contractors is no longer operating and that his general contractor's license has expired.

involving below-grade work or subsurface soil and water issues that required significant

excavation or as a general contractor for commercial projects.  Specifically, before he engaged

with Plaintiff, Defendant had worked on two projects that required supervision of geological

services engineers.

When Plaintiff's attempts over several months to hire contractors local to Putnam County

and in Nashville were unsuccessful, Mr. Soliman suggested HCC Contractors as the potential

contractor for the Project.  Mr. Soliman knew Defendant because he had renovated a portion of a

building that housed a restaurant that Mr. Soliman owned.  Mr. Soliman and Dr. Alouani, as

representatives for Plaintiff, met with Defendant more than once in early 2019, first at the Site[7]

and again at the Cookeville McDonald's[8] to discuss hiring HCC Contractors for the Project. Mr.

Soliman and Dr. Alouani provided Defendant with construction plans and the GEOS Report and

briefed Defendant about the subsurface soil and water issues at the Site, emphasizing that any

general contractor hired for the Project must have significant experience resolving subsurface

soil and water issues.  Defendant advised Dr. Alouani and Mr. Soliman that he had experience

with construction projects that were similar in nature, size, and complexity, including resolution

of complex subsurface soil and water issues.  As an example, Defendant referenced his role as

contractor for the Hindu Community Center located near Knoxville.  With Dr. Alouani's

approval, Mr. Soliman recommended to the Board that Plaintiff hire Defendant for the Project.

After reviewing several versions that were drafted primarily by Defendant, Plaintiff and

Defendant entered into a Construction Contract (the "Contract") on February 26, 2019, for the

---

[7] Dr. Alouani testified that Heath Latta, who he understood was HCC Contractor's Chief Financial Officer, was also at the in-person meeting at the Site in February 2019.

[8] Dr. Alouani testified that Heath Latta and George Ludlow, who he understood was HCC Contractor's project manager, were present at this meeting, at which the main focus was the geotechnical issues at the Site.

construction of a community center.  Dr. Alouani negotiated the terms with Defendant related to

the contract price of $550,680.00, the breakdown and amount of payments at various stages of

completion, and the division of the Project into three distinct phases of construction and

payment:  phase one, which included site preparation, excavating, grading, and subsurface utility

work ($161,000.00); phase two, which included construction of the building ($336,680.00); and

phase three, which included the final requirements to obtain a certificate of occupancy

($53,000.00).  The Contract required Defendant to commence phase one on or before March 24,

2019, and to fully complete the Project no later than August 25, 2019.

The Contract, which is governed by the laws of the State of Tennessee, included

Defendant's contractor's license number and required Defendant to provide all services, labor,

machinery, and materials necessary to complete the Project and to provide construction and

contracting services in a workmanlike manner in compliance with all applicable federal, state,

and local laws and regulations, utilizing a standard of care equal or superior to that used by

similar service providers on similar projects within the same community and region.  In addition,

Defendant agreed to indemnify and hold Plaintiff harmless from all claims, loss, liability, and

expense, including actual attorneys' fees, arising out of or in connection with Defendant's scope

of work under the Contract, even if Plaintiff was partially responsible for the same.  Material

default under the Contract included (a) Plaintiff's failure to make a payment when due; (b)

insolvency and/or the filing for bankruptcy by either party; (c) a lawsuit or foreclosure of any

kind by either party; and (d) the failure of Plaintiff to make the Site available or of HCC

Contractors to "deliver the Services in the time and manner provided for" in the Contract.

The Contract provided for phase one work in the total amount of $161,000.00 to be paid

over three draws:  an initial draw of $80,500.00 payable at the time of the contract ("First

Draw"); a second draw of $50,000.00 payable at the direction and approval of Mr. Soliman when work had progressed ("Second Draw"); and a third draw of $30,500.00 payable upon the completion of phase one.

### B.  The Project Progression

With signing of the Contract and payment of the First Draw at the end of February 2019, Defendant began clearing the Site of debris and vegetation for excavation.  In mid-March and early April, Defendant subcontracted with Ahern Rentals, VanhooseCo Precast, LLC ("VanhooseCo"), and Elk Mountain Construction Co. ("Elk Mountain") for rental equipment, pre-cast concrete pipes and related materials, and excavation services on the Project.  Defendant also hired three workers, George Ludlow, Tyler Ludlow, and Heath Latta, and arranged for them to live in a rental home in Cookeville adjacent to the Site that would be paid for directly by Defendant.

According to a Daily Field Report dated March 20, 2019, prepared by Jacob Ramsaur with GeoServices and accompanied by photos, the grade had been excavated approximately two feet below starting grade in the north parking area.  Because the bearing was sufficient, Ramsaur instructed Defendant to proceed with the same excavation across the rest of that parking area.  Concerning the rest of the Site, based on the debris and organic matter within the soil and the presence of bedrock, Ramsaur recommended that Defendant "completely undercut the building pad area plus 2-3 feet outside the pad down to bedrock and replace with shot rock material to subgrade elevation [and i]n the parking lot areas, cut out the unsuitable material an additional foot beyond current depth, add a layer of geofabric, and fill with shot rock material to subgrade elevation." [Tr. Ex. 62 at p. 39.]

Between April 1 and April 11, 2019, Elk Mountain performed extensive excavation on

the Site:  twelve feet at its deepest and covering an area that was twice that of the Project

building's footprint.  Because of the depth of the excavation, which was substantially deeper than

Plaintiff had anticipated or that Plaintiff understood was necessary for the Project building's size,

Plaintiff considered whether to add a basement to the Project.  While the Board was considering

the addition of a basement, work stopped at the Site.

Through Dr. Alouani, Plaintiff informed Defendant on April 17, 2019, that it had opted

not to include a basement and directed Defendant to fill the excavated area and continue with the

Project.  Additionally, as reflected in the Daily Field Report dated April 17, 2019, Ramsaur

"noted that the undercut area was fully excavated to a depth of approximately 11 feet below the

existing grade" and that the soil was "structurally sufficient for shot rock to begin being placed

within the building pad area" but that it was determined after a discussion with "the HCC onsite

superintendent" that a basement was not an option. [Tr. Ex. 62 at p. 44.]  Ramsaur recommended

adding a drainpipe "from the middle of the rock fill area under the building area to the retention

pond . . . also located in the northeast corner of the lot" to get rid of the water and avoid future

problems. [*Id.* at p. 44.]  In late April and early May, Elk Mountain delivered several loads of

crushed aggregate rock to the Site, and Defendant pumped water from the excavated area after

extensive rainfall.  Dr. Alouani testified that he observed no work and no noticeable progress at

the Site from April 17 to May 22, 2019.  On May 23, 2019, Dr. Alouani wrote a personal check

to Defendant for $10,000.00 because Defendant told Dr. Alouani that he had no funds left to

purchase rock to fill the hole at the Site.

On June 16, 2019, Defendant emailed Mr. Soliman, advising that he had "no resources

for anything," that he was "bankrupt," and that he would "be in [C]ookeville Monday to gather

[his] equipment." [Tr. Ex. 6 at p. 0164.]  In response, Plaintiff, through counsel, sent

correspondence to Defendant on June 19, 2019, advising that HCC Contractors was in default of the Contract for failure to comply with the terms of the Contract and because its contractor's license had expired or lapsed. Plaintiff also demanded that HCC Contractors return to the Project within ten days, cure all defaults under the Contract within that time, and immediately pay Elk Mountain for the work it had performed at the Site.

When Defendant removed his equipment and did not return to the Project after the June 19 letter from Plaintiff's counsel, Plaintiff terminated Defendant as general contractor of the Project and subsequently hired Bob Vick & Associates to complete the community center, which was approximately 90% finished as of trial. Plaintiff also filed a lawsuit in the Putnam County Chancery Court against HCC Contractors and Defendant, personally, for breach of contract, misappropriation of contract payments, breach of fiduciary obligations, indemnification, negligence, conversion, and embezzlement (the "State Lawsuit"[9]). The chancery court entered a default judgment "as to the issue of liability and as to the factual allegations" against HCC Contractors and Defendant on January 6, 2020. [Doc. 1, Ex. C.] Defendant subsequently filed the Voluntary Petition commencing a joint Chapter 7 bankruptcy case with Ms. Mayer[10] on August 7, 2020 [Bankr. Doc. 1 at p. 1], and Plaintiff filed this adversary proceeding on February 1, 2021.

### C. Tracking the Money

On February 27, 2019, Plaintiff paid the First Draw of $80,500.00, which Defendant deposited into a Pinnacle Bank account ending in *3094 (the "Pinnacle Account"[11]), yielding an

---

[9] The State Lawsuit also named as defendants Donald Batho and Michael Nesmith.

[10] Ms. Mayer received a discharge on January 31, 2022 [Bankr. Doc. 74].

[11] Although he set up Pinnacle Account as an account for HCC Contractors, Defendant, himself, used it only to facilitate quicker withdrawal of funds than he could obtain at the other financial institutions where he held accounts. He testified that David Johnson, who was the "general contractor" for the Hindu Community Center, operating under

ending daily balance of $128,858.21.[12]  The next day, Defendant obtained four cashier's checks

totaling $75,000.00 from the Pinnacle Account.  The cashier's checks were payable to: (1) Eddie

Samples in the amount of $5,000.00; (2) Nicole Mayer in the amount of $5,000.00; (3)

Defendant in the amount of $30,000.00; and (4) Defendant in the amount of $35,000.00.

Defendant later deposited the cashier's check to Eddie Samples for $5,000.00 back into the

Pinnacle Account.  On April 9, 2019, Defendant obtained another cashier's check to himself in

the amount of $1,500.00.  By April 10, 2019 (the date of the Second Draw), Defendant had

withdrawn from the Pinnacle Account $71,500.00 of the First Draw.[13]  Defendant testified at

trial that he is unable to account for the $9,000.00 that should have been remaining in the

Pinnacle Account from the First Draw.[14]

On March 1, the day after obtaining the initial cashier's checks from the Pinnacle

Account (and two days after depositing the First Draw), Defendant deposited the $30,000.00

cashier's check and the $5,000.00 cashier's check payable to Ms. Mayer into his and Ms.

Mayer's personal joint checking account at Y-12 Federal Credit Union ("Y-12 Joint Account").

Defendant testified that he used the Y-12 Joint Account for the job expenses of HCC

Contractors, including work he was finishing for other customers (e.g., Lux Nails and Ramsey)

---

HCC Contractor's general contractor's license, used the Pinnacle Account for that project.  Defendant opened the Pinnacle Account in HCC Contractors' name only because he had "pulled the building permit" for the Hindu Community Center using his license.  Defendant testified that with the exception of Defendant's deposits and subsequent withdrawals of the payments received from Plaintiff, none of the transactions arising out of Pinnacle Account were related to the Project, and Defendant did not pay any of the Project expenses directly out of the account.

[12] During trial, the parties elicited testimony about numerous bank records found at trial exhibits 33 through 54, 67, and 69.  In addition, the Court independently examined the bank records in detail to reach findings of fact that lie at the heart of this decision, as discussed below.

[13] This sum does not include the $5,000.00 cashier's check to Eddie Samples that was deposited back into the account.

[14] Although the Pinnacle Account records reflect a deposit of $25,000.00 on March 15, 2019, and a withdrawal of $5,000.00 on March 18, 2019, Defendant testified that he did not believe that those were transactions in which he was involved or that related to the Project.

while he was engaged on the Project.  On March 11, 2019, Defendant also deposited the $35,000.00 cashier's check payable to him into the Y-12 Joint Account.  The records also reflect that Defendant deposited the April 9, 2019 Pinnacle Account cashier's check payable to him in the amount to $1,500.00 into the Y-12 Joint Account.  Thus, it appears that all of the $71,500.00 withdrawn from the Pinnacle Account (from the First Draw) was deposited directly into the Y-12 Joint Account.

Seeing that excavation work had been done, on Defendant's request, Plaintiff paid the Second Draw of $50,000.00 on April 9, 2019.  Defendant deposited the UCIS check into Pinnacle Account on April 10, resulting in an account balance of $47,622.29. [15]  Over six days between April 10 and April 16, Defendant withdrew by cash or cashier's check from the Pinnacle Account a total of $34,800.00 that he then deposited into the Y-12 Joint Account.  In addition, on April 11 and 12, he withdrew from the Pinnacle Account cash totaling $13,500.00 for which there exists no corresponding deposit into any other account.  Defendant also obtained a $25,000.00 cashier's check payable to Elk Mountain on April 12, 2019, but he deposited the funds back into the Pinnacle Account four days later after the owner of Elk Mountain told Defendant he could pay Elk Mountain over time.  Thus, with reductions of $48,300.00 from the $50,000.00 Second Draw, the Pinnacle Account should have held the remaining $1,700.00 as of June 2019; however, the Pinnacle Account was overdrawn in the amount of $1,072.41 on June 3.  Thus, $10,600.00 (i.e., $9,000.00 that should have been in the Pinnacle Account from the First Draw and $1,700.00 that should have been in the Pinnacle Account from the Second Draw) disappeared wholly without explanation by Defendant.

---

[15] Given that the deposit of $50,000.00 resulted in a balance of less than $50,000.00, the $9,000.00 that should have been remaining in the Pinnacle Account from the First Draw was unexplainably depleted as of April 10, 2019 (presumably diverted to the Hindu Community Center project).

On April 16, 2019, Defendant opened business share and checking accounts at Y-12 Federal Credit Union (the "Y-12 Business Share Account" and the "Y-12 Business Checking Account") by transferring $15,000.00 of the Second Draw funds that he had deposited in the Y-12 Joint Account (which deposits totaled $34,800.00).  He later transferred another $7,300.00 from the Y-12 Joint Account to the Y-12 Business Share Account.[16]  Defendant, however, also transferred back to the Y-12 Joint Account a total of $4,220.00 from the Y-12 Business Checking Account.[17]  Defendant's transfers between accounts appears chaotic and difficult to understand.[18]

From his March 1, 2019 deposit of the First Draw proceeds withdrawn from the Pinnacle Account into the Y-12 Joint Account to April 10, 2019 (the day of the Second Draw), Defendant withdrew cash totaling more than $29,700.00.[19]  From April 10, 2019 to June 13, 2019, Defendant withdrew cash from the Y-12 accounts totaling more than $30,250.00.[20]  Thus, including the $13,500.00 in cash withdrawn by Defendant from the Pinnacle Account after the Second Draw, Defendant withdrew cash totaling more than $43,750.00 from the Pinnacle and Y-12 accounts after the Second Draw.  Finally, Defendant's cash withdrawals from all accounts from the date of the First Draw through June 13, 2019, total more than $73,450.00.

---

[16] These transfers were: $3,000.00 on May 13; another $2,000.00 on May 13; and $2,300.00 on May 15.

[17] These transfers were: $2,000.00 on May 3; $500.00 on May 7; $500.00 on May 9; $720.00 on May 16; and $500.00 on May 24.

[18] Although a number of nefarious possibilities come to mind, the Court will not speculate about the rationale behind Defendant's transfer activity and frequent cash withdrawals.

[19] The account statements often reflect multiple ATM transactions (and sometimes multiple cash withdrawals from a teller) on the same day.  It appears that Defendant's maximum ATM withdrawal was $200.00, which may account for the multiple withdrawals on the same day.

[20] Defendant withdrew $11,714.00 from the Y-12 Joint Account and $18,543.00 from Y-12 Business Checking Account.

Concerning labor expenses for the Project, from March 11, 2019 through May 23, 2019, Defendant transferred from one of the three Y-12 accounts to a Y-12 account held by George Ludlow the total sum of $13,250.00.[21]  Defendant testified that George Ludlow started work on the Project in mid-March at a rate of $1,500.00 per week.  Assuming that work began as early as March 9, 2019, when a payment was made to Stowers Rentals in Cookeville, and accepting Defendant's assertion at trial (although disputed by Plaintiff's witnesses) that work was stopped in mid-June, work at the Site for which George Ludlow would have been paid spanned no more than fifteen weeks, for a total salary of $22,500.00, of which $13,250.00 was transferred to George Ludlow's Y-12 account.

Defendant testified that he paid wages in cash (except for the transfers to Ludlow's account).  If Defendant's testimony is accepted as true and the Court credits Defendant with paying wages to three people over the entire fifteen weeks between March 9 and June 12,[22] Defendant would have paid cash for wages totaling no more than $38,650.00 as follows:  (1) George Ludlow no more than $9,250.00, (2) Heath Latta no more than $15,000.00,[23] (3) Tyler Ludlow no more than $12,000.00, (4) "Cole" no more than $1,200.00, and (5) "Sam" no more than $1,200.00. Defendant also asserted that he budgeted $500.00 per week[24] for the living

---

[21] The transfers were:  $1,500.00 on March 11, $1,200.00 on March 14, $1,200.00 on March 21, $1,200.00 on March 28, $1,200.00 on April 5, $1,200.00 on April 16, $1,350.00 on April 24, $1,300.00 on May 1, $1,200.00 on May 9, $100.00 on May 14, $800.00 on May 16, $1,000.00 on May 23.  Defendant testified that these transfers were for wages for George Ludlow's work on the Project but that he also paid George Ludlow in cash at times and that his wages on the Project were $1,500.00 per week.

[22] Notably, the Court has not reduced the fifteen weeks of wages by any of the time that work admittedly was stopped in April for Plaintiff to decide about a basement.

[23] Giving Defendant the benefit of the doubt, this amount has not been reduced by the $1,000.00 paid to Heath Latta by cashier's check from the Y-12 Business Checking Account on July 24, 2019, well after work had stopped at the Site.

[24] He also testified that he left cash of $100.00 per day for the three workmen combined at the individual rate of $35.00 per diem for expenses.  This testimony conflicts with the account records that show food and drink charges in

expenses of the three workers, which over fifteen weeks calculates to $7,500.00.  He testified

also that the maximum payment for gas and diesel for use on the Project was $250.00 per

week,[25] which over thirteen weeks computes to $3,250.00 (some of which was paid by check

and debit transactions).

Finally, relating to the use of cash for the Project, Defendant testified that before he

received the additional $10,000.00 from Dr. Alouani on May 23, 2019, he had not paid Rogers

Group any cash for rock or stone.  He stated that any receipts that would have been obtained for

rock from Rogers Group would have been stored in the dump truck that he had purchased for the

Project at a price of $2,500.00[26].  Defendant also testified that the total cost of rock during the

three months that he worked on the Project did not exceed $7,000.00.  Reducing that amount by

the $1,071.47 in debit charges to Rogers Group in late May, the most cash that Defendant would

have paid for rock for the Project would have been just over $5,900.00.

The following calculation summarizes the expenses of the Project paid in cash according

to Defendant's testimony:

| | |
|---|---|
| Labor: | $38,650.00 |
| Per Diem for Workers: | $ 7,500.00 |
| Gas and Diesel: | $ 3,250.00 |
| Dump Truck: | $ 2,500.00 |
| Rock: | $ 5,900.00 |
| TOTAL EXPENSES ALLEGEDLY PAID IN CASH: | $57,800.00 |

---

Cookeville that clearly are for more than one individual.  Nonetheless, for purposes of trying to account for cash withdrawals by Defendant, the Court is crediting Defendant with the $500.00 per week.

[25] The bank records also reflect multiple fuel charges in Cookeville.  The Court again has given Defendant credit for his assertion that he paid cash for gas and diesel.

[26] Defendant resold at some point for $1,700.00.

With cash withdrawals totaling $73,450.00, Defendant has failed to account for the remaining

cash withdrawn totaling $15,650.00.

In addition, the Court has reviewed the bank records to compute all possible Project

expenses from (1) debit charges that occurred in Cookeville (excepting golf club charges but

including all food and beverage charges, even those at Happy Hour Cookeville, Nowhere Bar,

Father Tom's Pub, Kwik Kash Pawn, and Discount Tobacco & Beverage) and (2) check

payments for rent and diesel fuel asserted to be expenses of the Project. These "expenses" total

$33,222.07.[27]

To reach a total dollar amount that Defendant allegedly spent on the Project, the Court

adds to the expenses that Defendant allegedly paid with cash (1) the Cookeville debit charges

and the checks for rent and diesel fuel and (2) the account transfers to George Ludlow for

additional labor payments as follows:

| | |
|---|---|
| Expenses Paid in Cash: | $ 57,800.00 |
| Debit & Checks: | $ 33,222.07 |
| Transfers to Ludlow Account: | $ 13,250.00 |
| TOTAL PROJECT EXPENSES: | $104,272.07 |

Thus, even giving Defendant the full benefit of the doubt as to his testimony concerning

cash expenses for which he has virtually no receipts or records and debit transactions in

Cookeville, the Court concludes that of the $140,500.00 paid to him by UCIS and Dr. Alouani,

Defendant has failed to account for more than $36,000.00. This represents more than 25% of the

total amount paid by UCIS and Dr. Alouani.

Defendant attempted to explain his lack of records by claiming that he delivered his

---

[27] This amount includes debit transactions for payments to Rogers Group discussed above.

records to his accountant in early 2020, just before her office closed because of the COVID-19

pandemic.  Although the accountant's office was open by July 2020,[28] Defendant said that she

later closed her office.  He later learned that she had died, and he claimed at trial that he was

unable to obtain the records he had left for her early in 2020.  The records were requested by the

Chapter 7 trustee at the meeting of creditors and as part of the Rule 2004 examination of Debtor,

in September 2020 and January 2021, respectively.

Plaintiff also sought the records in discovery related to this adversary proceeding, but

Defendant did not produce the records to his counsel until November 5, and they were not

produced to Plaintiff's counsel until November 9, which was nine days before the scheduled

final pretrial conference and ten days before the first day of trial.  Supposedly, out of the blue,

Defendant's father-in-law informed Ms. Mayer that he had obtained Defendant's records from

the deceased accountant's family.  Plaintiff objected to the use of the records at trial (proposed

by Defendant as Trial Exhibit 67).  At a hearing on November 10 on other pretrial motions and

objections, the Court ordered Defendant to produce bates-stamped records and to file a notice in

which Defendant was to identify which bates-stamped pages he intended to use to support this

defenses to Plaintiff's claims at trial.

Trial Exhibit 67 consisted of 378 pages of records identified by Defendant as his 2019

business receipts.  Defendant identified only thirteen of the 378 pages as relating to the Project.

Of those, however, only ten pages (totaling thirteen receipts)[29] in fact related to the Project and

none were receipts for cash expenditures.  Thus, Defendant produced receipts for the following

---

[28] Defendant testified that he stopped by to sign his 2018 tax return in July 2020.

[29] Defendant admitted at trial that pages 0154 and 0157 of Trial Exhibit 67, identified by Defendant as related to the Project, in fact were deposits of payments from two of Defendant's then active jobs (i.e., Ramsey and Lux Nails). Also, page 0169 of Trial Exhibit 67, initially identified as related to the Project, was not so related, according to Defendant's trial testimony.

expenses.[30] related to the Project:

| Date | Seller | Amount | Cash/Debit | Purpose |
|------|--------|--------|------------|---------|
| March 6 | Lowe's | $239.75 | Debit | Miscellaneous |
| March 13 | Lowe's | $261.74 | Debit | Miscellaneous |
| March 14 | Kwik Kash Pawn | $439.00 | Debit | Unknown |
| March 20 | Tractor Supply | $43.88 | Debit | Fuel Can |
| April 1 | Middle TN Disposal | $188.90 | Unknown[31] | Container & Haul[32] |
| April 2 | Middle TN Disposal | $340.89 | Unknown | Container, Haul, & Disposal |
| April 16 | Harbor Freight | $526.76 | Debit | Miscellaneous |
| April 16 | Harbor Freight | $18.65 | Debit | Fuel Can |
| April 16 | Lowe's | $19.58 | Debit | Miscellaneous |
| April 30 | Selk Sanitation | $82.31 | Unknown | Portajohn |
| May 3 | Y-12 Joint Account | $1,450.00 | Cash | "Payroll".[33] |
| May 3 | Y-12 Joint Account | $2,000.00 | Cash | "Payroll" |
| May 15 | Y-12 Joint Account | $620.00 | Cash | "Payroll" |

Defendant admitted that the receipts that are included in Trial Exhibit 67 are the only receipts that he kept for the Project and he is not aware of any additional documents submitted to his accountant that are not in Trial Exhibit 67. Thus, excluding the "receipts" that reflect nothing more than cash withdrawals, Defendant produced receipts for the Project totaling less than $2,200.00 of the more than $91,000.00 he supposedly expended (not including the transfers to George Ludlow's account).

Notably, although Defendant testified that he dropped off the records to his accountant in early 2020 (i.e., before the January 31 deadline for issuance of Forms 1099), she never prepared

---

[30] Each of the identified debit transactions are included in the expense totals discussed above.

[31] The invoices from Middle TN Disposal are stamped "past due." Defendant testified that those invoices and the one from Selk Sanitation were paid, but he was unable to say how.

[32] The first invoice from Middle TN Disposal reflects an "initial haul" on March 5, 2019, and a container fee from March 5 to March 31.

[33] Defendant initially identified the cash withdrawals from the Y-12 Joint Account as "payroll." At trial, he testified that these cash withdrawals from the Y-12 Joint Account "could be used for payroll" even though by May 3, he had opened the Y-12 Business Checking Account and was using it for his business.

Form 1099s for his subcontract laborers for the work performed in 2019.  Moreover, in an
apparent contradiction, Defendant also testified that he, himself, had prepared the Form 1099s in
recent years.  He stated that none of the people who worked for him in 2019 had ever received a
Form 1099 for that year.  Finally, although Defendant had begun paying his bankruptcy attorney
on May 30, 2018,[34] more than two years before he filed the Chapter 7 petition, and even though
he had been instructed by his bankruptcy attorney that he needed tax returns for his bankruptcy
filing, Defendant did not even ask his accountant about an extension for filing his 2019 return.

A review of Trial Exhibit 67 reveals that the records produced by Defendant in the form
of unlabeled receipts, invoices, deposit slips, and bank statements were disorganized and did not
clearly identify any project to which they were related.  Defendant testified that he followed the
example set by his father, never kept receipts for cash payments, and used only bank records and
receipts as requested by his accountant.

Defendant did not pay the companies he hired to work on the Project from the
$140,500.00 he received from Plaintiff and Dr. Alouani.  As a result, Plaintiff received invoices
and notices of liens on the Site in the aggregate amount of $161,734.26[35] from Ahern Rentals,
VanhooseCo, and Elk Mountain in late May or early June.  After negotiating to settle the
subcontractors' claims, Plaintiff made the following payments totaling $83,000.00 for release of
the respective liens:  (1) $18,000.00 to Ahern Rentals on its $45,973.40 claim, (2) $5,000.00 to
VanhooseCo on its $8,647.36 claim; and (3) $60,000.00 to Elk Mountain on its $107,113.50
claim.

---

[34] *See* Bankr. Doc. 1 at p. 14.

[35] At trial, Defendant testified that he disagreed with the last date of service and the amount due that are reflected on
the Notice of Lien and Sworn Statement recorded by Ahern Rentals and disagreed with the first date of service and
the amount reflected on the Notice of Lien recorded by Elk Mountain; however, he had no documentation to support
his disagreement as to either company's failure to credit any payments or the like.

## II.  ANALYSIS

Through this adversary proceeding, Plaintiff seeks a judgment against Defendant for
damages resulting from the Project and either a determination that the judgment is
nondischargeable under 11 U.S.C. § 523(a)(2)(A), (4), or (6), or a denial of Defendant's
discharge pursuant to 11 U.S.C. § 727(a)(3).  Courts construe actions brought under § 727(a) and
§ 523(a) liberally in favor of debtors, and the party objecting to discharge or seeking a
determination of nondischargeability bears the burden of proof by a preponderance of the
evidence. *Keeney v. Smith (In re Keeney),* 227 F.3d 679, 683 (6th Cir. 2000); Fed. R. Bankr.
P. 4005; *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Rembert v. AT&T Universal Card Servs.,
Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).  Because a denial of Defendant's
discharge affects all creditors and not merely Plaintiff, the Court will first address the objection
to Defendant's discharge.

### A.  Objection to Discharge under 11 U.S.C. § 727(a)(3)

Under 11 U.S.C. § 727(a)(3), the Court may deny a debtor's discharge for failing "to
keep or preserve any recorded information, including books, documents, records, and papers,
from which the debtor's financial condition or business transactions might be ascertained, unless
such act or failure to act was justified under all of the circumstances of the case."  Section
727(a)(3) is intended "'to make the privilege of discharge dependent on a true presentation of the
debtor's financial affairs.'" *Layng v. Aydt (In re Aydt)*, No. 20-20738, A.P. No. 20-02103-beh,
2022 WL 107334, at *23 (Bankr. E.D. Wis. Jan. 11, 2022) (quoting *Peterson v. Scott (In re
Scott)*, 172 F.3d 959, 969 (7th Cir. 1999) (internal quotation marks omitted)).  "Creditors are not
required to accept a debtor's unsubstantiated oral testimony in lieu of concrete written records . . .
or 'to risk the withholding or concealment of assets by the bankrupt under cover of a chaotic or

incomplete set of books or records[.]'" *Id.* (citations omitted).

Section 727(a)(3) actions are analyzed using a burden-shifting approach; therefore, Plaintiff – the party objecting to discharge – bears the burden of proving that Defendant has failed to keep material records. *Bavely v. Daniels (In re Daniels)*, 641 B.R. 165, 184 (Bankr. S.D. Ohio 2022) (citing *CM Temp. Servs. v. Bailey (In re Bailey)*, 375 B.R. 410, 415-16 (Bankr. S.D. Ohio 2007)).  If Plaintiff satisfies this initial requirement, the burden shifts to Defendant, who must justify his lack of records. *Crocker v. Stiff (In re Stiff)*, 512 B.R. 893, 897 (Bankr. E.D. Ky. 2014).  "[T]he standard under this provision is one of reasonableness." *Dantzler v. Zulpo (In re Zulpo)*, 592 B.R. 231, 237 (Bankr. E.D. Ark. 2018).  Although debtors are not required to provide "perfect, or even necessarily complete, records[,]" *In re Bailey*, 375 B.R. at 415, they are responsible for providing sufficient past and current financial information, and they must produce documentation "with enough information to ascertain [their] financial condition and track [their] financial dealings with substantial accuracy for a reasonable period past to present." *Ayers v. Babb (In re Babb)*, 358 B.R. 343, 353-54 (Bankr. E.D. Tenn. 2006) (citations omitted). "[V]ague and indefinite explanations, uncorroborated by documentation, [are] not sufficient under § 727(a)(3)." *Randolph v. Whitaker (In re Whitaker)*, No. 18-30073, Adv. No. 19-03002, 2020 WL 1182667, at *4 (Bankr. E.D. Ky. Mar. 10, 2020) (citing *United States v. Trogdon (In re Trogdon)*, 111 B.R. 655, 659 (Bankr. N.D. Ohio 1990)).  Additionally, "[a] lack of business records relating to a company substantially intertwined with a debtor may provide the basis for the denial of a debtor's individual discharge under § 727(a)(3)." *U.S. Tr. v. Kandel (In re Kandel)*, No. 11-62597, Adv. No. 12-6003, 2015 WL 1207014, at *8 (Bankr. N.D. Ohio Mar. 13, 2015).

Whether a debtor's records are adequate is a fact-specific inquiry. *In re Daniels*, 641 B.R.
at 184 (citing *McDermott v. Roller (In re Roller)*, No. 12-61145, Adv. No. 13-6050, 2014 WL
644590, at *11 (Bankr. N.D. Ohio Feb. 19, 2014)).   A debtor is "not required to keep an
impeccable system of bookkeeping, or to maintain records so complete that he can satisfy an
expert in business[;] . . . the test is whether there is available written evidence made and
preserved from which the debtor's present financial condition, and his business transactions for a
reasonable period in the past, may be ascertained with substantial completeness and accuracy."
*Pu v. Mitsopoulos (In re Mitsopoulos)*, 487 B.R. 604, 611-12 (Bankr. E.D.N.Y. 2013) (citations
omitted); *see also Stephens v. Morrison (In re Morrison)*, 450 B.R. 734, 747 (Bankr. W.D. Tenn.
2011) ("The test is not whether the debtor could determine what was happening in his business,
but [rather] whether a third-party such as a trustee or creditor could determine from the records
what has happen[ed] in the debtor's business.").   Typically, debtors who operate businesses are
held to a higher level of recordkeeping than those who do not. *In re Daniels*, 641 B.R. at 184
(citing *In re Roller*, 2014 WL 644590, at *11).

Because intent is not an element under § 727(a)(3), courts have broad discretion to
determine the adequacy of a debtor's records on a case-by-case basis, measuring a debtor's
records "against the type of books and records kept by a reasonably prudent debtor with the same
occupation, financial structure, education, and experience." *In re Babb*, 358 B.R. at 354 (citing
*Dolin v. N. Petrochemical Co. (In re Dolin)*, 799 F.2d 251, 253 (6th Cir. 1986)).   A debtor's
credibility "has a bearing on his entitlement to a discharge." *Patriot Grp. v. Fustolo (In re
Fustolo)*, 587 B.R. 1, 42 (Bankr. D. Mass. 2019).   Generally, courts consider the following:

> (1) whether the debtor was engaged in business, and if so, the complexity and
> volume of the business; (2) the amount of the debtor's obligations; (3) whether the
> debtor's failure to keep or preserve books and records was due to the debtor's fault;
> (4) the debtor's education, business experience and sophistication; (5) the

customary business practices for record keeping in the debtor's type of business;
(6) the degree of accuracy disclosed by the debtor's existing books and records; (7)
the extent of any egregious conduct on the debtor's part; and (8) the debtor's
courtroom demeanor.

*Hendon v. Lufkin (In re Lufkin)*, 393 B.R. 585, 593 (Bankr. E.D. Tenn. 2008) (citations omitted).

Although "a combination of factors, including the debtor's personal situation and

circumstances beyond the debtor's control" may provide justification for less than stellar records.

*Pereira v. Young (In re Young)*, 346 B.R. 597, 610 (Bankr. E.D.N.Y. 2006), the failure to

produce invoices and/or receipts for items purchased for cash, or even records that are no longer

available due to computer malfunction, may fall within the scope of § 727(a)(3). *In re Morrison*,

450 B.R. at 747; *In re Babb*, 358 B.R. at 354 (citations omitted).  Additionally, "a debtor's

failure to file tax returns can amount to a violation of § 727(a)(3)[,]" especially when "the debtor

has failed to file tax returns for himself or his businesses for several years in a row." *In re*

*Daniels*, 641 B.R. at 186.  While a debtor's sophistication is a factor, a lack of sophistication "is

not an excuse for entirely failing to produce records." *Desiderio v. Devani (In re Devani)*, 535

B.R. 26, 34 (Bankr. E.D.N.Y. 2015).

Critical for the Court's determination here, "[r]ecords are even more important when a

business is conducted primarily in cash." *In re Whitaker*, 2020 WL 1182667, at *3.

While very modest records may be reasonable for a simple sole proprietorship with
few obligations, a business that (1) operates significantly with cash, that (2) has
expenses indistinguishable from and intertwined with personal expenses, and (3)
has or can be expected to have substantial obligations must have more detailed
accounting documentation . . . .

. . . .

Debit card or bank statements might be sufficient to satisfy a writing requirement
even without additional recordkeeping on behalf of a debtor, as they create a record
maintained by the financial institution. But ATM withdrawals require additional
documentation as they are much more like missing cash from a register than a series
of receipts detailing when and how the money was spent.

*MoSex Exhibit I, LLC v. Campbell (In re Campbell)*, No. 19-00042-ELG, Adv. No. 19-10025,

2021 WL 4517424, at *6 (Bankr. D.D.C. Sept. 30, 2021) (internal citations omitted).

      The bankruptcy court's decision in *In re Whitaker* is instructive concerning the

application of § 727(a)(3) to contractors and record-keeping deficiencies.  There, the debtor

operated his construction business as a sole proprietorship. *In re Whitaker*, 2020 WL 1182667, at

*1.  Although he initially performed the majority of the work himself, the debtor eventually

began to rely almost exclusively on subcontractors that he hired for jobs on a daily or weekly

cash basis. *Id*.  In addition to his subcontractors' labor and gas, the debtor paid for his own gas,

food, drinks, expenses, and materials primarily through cash by cashing checks at a convenience

store and withdrawing large sums from his bank accounts from ATMs. *Id*.  He did not maintain

contemporaneous records of his expenses; instead, "his business records consist[ed] of monthly

bank statements, returned checks, credit card statements, purchase invoices, customer contracts

and estimates, and other miscellaneous receipts." *Id*. at *2.  Notwithstanding the debtor's

attempts to get control of his business, he lost records in a building fire, among other things, and

eventually, filed a Chapter 7 bankruptcy case. *Id*.  He was not, however, forthcoming with

records, and, as noted by the bankruptcy court, "the Plaintiff [United States Trustee] spent a

significant amount of time trying to get information from Whitaker before and after th[e]

adversary proceeding was filed." *Id*.

      In its ruling that the debtor was not entitled to a discharge, the bankruptcy court

determined that the debtor's exhibits and testimony had not provided an understanding of his

financial condition or business practices, and his testimony was not reliable. *See id*. at *3-4.  The

court first observed the following about the records presented:

            Whitaker provided almost 9,000 pages of haphazardly presented

>   documents. . . .  The documentary evidence did not paint a complete or accurate
>   picture of Whitaker's financial condition or business transactions.  The documents
>   were disorganized and Whitaker's numbering system is not easy to understand.
>   Many documents are repetitive, particularly the early summaries which merely
>   restructure the Plaintiff's summary judgment proof. . . .
>
>   It is a debtor's duty to maintain and produce records of his financial
>   dealings; it is not the responsibility of his creditors (or the Plaintiff or this Court) to
>   reconstruct those business records after the fact. . . .
>
>   Three days of testimony did not clarify the inconsistencies in the record.
>   Whitaker's testimony was disjointed and inadequate. . . .  At the close of testimony,
>   the parties were no closer to understanding Whitaker's financial condition or
>   business transactions.

*Id*. at *4 (internal docket references and case citations omitted).

Regarding the debtor's credibility, the bankruptcy court stated that although the debtor's

testimony concerning his frequent underbidding of jobs, increased expenses, and his practice of

taking out short-term loans with high interest rates initially came across as credible, the court

could not ignore that "missing and erroneous information hampered Whitaker's effort to prove

sources and uses of funds" and his testimony could not "withstand close scrutiny." *Id*.  In finding

that "[t]he presentation of evidence left the Court unable to connect Whitaker's scattered

testimony to the exhibits or to recreate his financial picture[,]" the court observed:

>   Whitaker's testimony is based on a re-creation of his finances from memory
>   after reviewing thousands of pages of unorganized documents.  His testimony was
>   general, vague, and often scattered.  Whitaker has not filed tax returns since 2016
>   and testified that the filed returns are unreliable.  Whitaker rarely linked distinct
>   case transactions to specific business expenses, except for the payments made to
>   his girlfriend. Such vague and indefinite explanations, uncorroborated by
>   documentation, is not sufficient under § 727(a)(3). . . .  The testimony is not reliable
>   or helpful.

*Id*. (citations omitted).  Because the debtor did not meet his burden of proving that his lack of

records was justified, the bankruptcy court denied his discharge under § 727(a)(3). *Id*. at *5; *see

also In re Campbell*, 2021 WL 4517424, at *6 (denying the debtor's discharge based on "simply

no written documentation as to how the ATM cash was disposed of, and only very general

testimony [concerning his lack of written records]"); *Smith v. Morse (In re Morse)*, 535 B.R.

268, 285 (Bankr. E.D. Tenn. 2015) (denying the motion for summary judgment seeking to

dismiss a § 727(a)(3) action against the debtor, the owner of a construction business who did not

keep records indicating how funds were spent on specific projects and, instead, "just threw

invoices into a box without examining to which project they related," with the court noting that

"although the Defendants have provided the court with over 1,200 pages of financial records,

these records are not organized in any way that would be helpful to determine exactly how the

Plaintiff's $100,000 was spent").

Here, the Court finds that, based on the record presented, Plaintiff clearly satisfied its

initial burden of proving that Defendant did not maintain adequate material records. Further, the

Court finds that Defendant did not justify his lack of records sufficient to preclude denial of his

discharge.  In fact, Defendant's testimony concerning his records and bank accounts was

inconsistent and, thus, not credible.

Notwithstanding documentation to show that HCC Contractors was a general partnership,

Defendant testified that throughout its existence, he was the sole owner and employee of HCC

Contractors, and his tax returns reflect that HCC Contractors was a sole proprietorship. He also

signed an affidavit in the State Lawsuit on April 27, 2020, affirming that he was the sole partner

of HCC Contractors.[36]

Defendant testified he did not use any bookkeeping software, keep a formal ledger, or

employ a bookkeeper to maintain his records.  Instead, he used receipts and bank statements to

---

[36] In the affidavit, Defendant admitted that he forged the signature of Michael Nesmith on credit applications and that he had lied about Mr. Nesmith's involvement as a partner in the application for renewal of his general contractor's license.

keep track of his expenditures, used his memory or sometimes wrote things down as a way of identifying and/or organizing his records, and he kept his receipts by putting them on a desk in his home office.  Defendant stated that Ms. Mayer assisted him in keeping his records for tax purposes.  Although Defendant testified that he hired his subcontractors as Form 1099 contractors, at trial, he conceded that he had never provided a Form 1099 to George Ludlow, Tyler Ludlow, Heath Latta, or any of the individuals that he said were paid cash for labor on the Project.  Notably, Defendant testified that none of these individuals ever requested a Form 1099 from HCC Contractors for labor performed on the Project.  Additionally, other than the transfers to George Ludlow's account, Defendant produced no records evidencing payments to any of the people he said worked on the Project.

Defendant had accounts at four banks that he used either personally or for HCC Contractors:  Regions Bank, Pinnacle Bank, Y-12 Federal Credit Union, and ORNL Federal Credit Union, and he had employed the same accountant to do his taxes since 2006.  Defendant argued that the records he maintained were sufficient for his small business, that he used business checking accounts for disbursements, and that the accountant had always been able to complete his tax returns based on the receipts and records he had provided to her.  As of the trial date, Defendant had yet to file tax returns for either 2019 or 2020.

In support of Defendant's attempts to explain his business practices, Ms. Mayer testified that she assisted Defendant in maintaining his business receipts at their home office and that she assisted him to assemble the receipts and deliver them to the accountant.  Both Defendant and Ms. Mayer testified that it was their normal practice to provide the accountant with the bank account records and miscellaneous receipts to prepare their taxes so that because there were no other reporting requirements, they did not do any additional recordkeeping.

Concerning receipts that were retained, both Defendant and Ms. Mayer testified that Defendant would put any receipts that he had on the desk in their home office and that Ms. Mayer would collect them for the accountant.  There was no testimony about any method of organizing or maintaining the records according to the specific job they were associated with or how the receipts were kept between the time Defendant left them on the desk and Ms. Mayer delivered them to the accountant during tax season.  Defendant also testified that he kept a ledger of cash payments for labor; however, Ms. Mayer's testimony was contradictory, and no such ledger was introduced into the record.  When questioned about organizing the documentation as to individual projects, Defendant testified that he "wasn't concerned" about which receipts went with which projects and that it had "always worked out" before the Project.

Moreover, although intent is not a requirement under § 727(a)(3), the Court cannot ignore that Defendant was not forthcoming with and submitted incorrect records and information to the State of Tennessee in connection with HCC Contractors and his contractor's license.  Defendant testified that he took and passed the general contractor test, but because he did not have assets sufficient for the required monetary limit in 2010, he represented that HCC Contractors was a general partnership consisting of himself and Mr. Bathos, who put up the necessary assets.  In 2012, Mr. Bathos no longer wanted to be involved, so Defendant did not seek to renew the license again until 2014.  Because he still did not have sufficient assets, Defendant submitted the renewal application containing financial information for Mr. Nesmith and falsely identifying HCC Contractors as a general partnership of which Defendant held 70% ownership interest and Mr. Nesmith held 30% ownership interest.  He repeated the lie for subsequent years, eventually submitting the license renewal applications online, all of which continued to identify HCC Contractors as a partnership.  Defendant testified at trial that because HCC Contractors is no

longer in business, the license expired, and he acknowledged that the Wells Fargo Bank account

recited in the 2017 and 2019 renewal applications as having a balance of $50,501.00 was owned

solely by Mr. Nesmith.

Defendant's records here are woefully inadequate as "written evidence made and

preserved from which the debtor's present financial condition, and his business transactions for a

reasonable period in the past, may be ascertained with substantial completeness and accuracy."

*In re Mitsopoulos*, 487 B.R. at 611-12.  Of the $140,500.00 that Defendant received for the

Project, he failed to produce records for more than $73,000.00 in cash withdrawals from funds

received for the Project.  Furthermore, the records produced by Defendant in the form of

unlabeled receipts, invoices, deposit slips, and bank statements were disorganized and did not

clearly identify the project to which they were related.  Defendant's assertions that he followed

the example set by his father, never kept receipts for cash payments, and used only bank records

and receipts as required by his accountant simply do not sufficiently justify the lack and

incompleteness of his records.  To be sure, beginning in March 2020, the COVID-19 pandemic

created an extraordinary situation for the entire world, Defendant included.  But Defendant

admitted that the records he eventually produced on the eve of trial were complete in terms of

what he had provided to his accountant in early 2020, before the pandemic disruption.

For these reasons, Plaintiff has satisfied its burden by a preponderance of the evidence,

and Defendant has not justified his failure to keep and preserve sufficient financial records.

Thus, Defendant's discharge will be denied under § 727(a)(3).

**B. Nondischargeability under § 523(a)(4) – Fraud or Defalcation by a Fiduciary**

Notwithstanding denial of Defendant's discharge under § 727(a)(3), the Court also finds

that, based on the record, Plaintiff met its burden of proving that any debt it is owed by

Defendant is nondischargeable under § 523(a)(4) because it was incurred by defalcation while

acting in a fiduciary capacity, which encompasses embezzlement as well as the failure to

properly account for any funds.[37] *Bd. of Trs. of the Ohio Carpenters' Pension Fund v. Bucci (In*

*re Bucci),* 493 F.3d 635, 639 (6th Cir. 2007) (citations omitted).   Under Sixth Circuit authority,

defalcation by a fiduciary serves as the basis for a nondischargeable debt only if the plaintiff

proves "(1) a pre-existing fiduciary relationship; (2) breach of that relationship; and (3) resulting

loss." *Patel v. Shamrock Floorcovering Servs., Inc. (In re Patel)*, 565 F.3d 963, 968 (6th Cir.

2009).

**1.  Fiduciary Relationship**

Whether a fiduciary relationship exists is a question of federal law. *Commonwealth Land*

*Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 390 (6th Cir. 2005).   In the Sixth Circuit, a

fiduciary relationship is found only in "those situations involving an express or technical trust

relationship arising from placement of a specific res in the hands of the debtor." *R.E. Am., Inc. v.*

*Garver (In re Garver)*, 116 F.3d 176, 180 (6th Cir. 1997).   Based on this requirement, the Sixth

Circuit has reiterated on many occasions that "the existence of a state law 'agent-principal

relationship standing alone is insufficient to establish the type of fiduciary duty contemplated by

---

[37] Embezzlement is defined by the Sixth Circuit as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996).  Because defalcation by a fiduciary includes embezzlement, it is unnecessary for the Court to further examine whether Defendant embezzled the monies received from Plaintiff through the respective Draws. Larceny, the third prong for nondischargeability under § 523(a)(4), is also the fraudulent misappropriation of funds; however, it differs from embezzlement because possession of the property was never lawful. *See First Nat'l Bank v. Simerlein (In re Simerlein)*, 497 B.R. 525, 537 (Bankr. E.D. Tenn. 2013).  Plaintiffs do not allege and did not present any facts to support larceny as a basis for nondischargeability under § 523(a)(4).

§ 523.'" *Bruinsma v. Wigger (In re Wigger)*, 595 B.R. 236, 257 (Bankr. W.D. Mich. 2018)

(quoting *In re Blaszak*, 397 F.3d at 391).[38]  Instead, § 523(a)(4) "applies to 'trustees who

misappropriate funds held in trust, and not to those who failed to meet an obligation under a

common law fiduciary relationship.'  To except a debt from discharge under § 523(a)(4)'s

defalcation provision, the creditor must establish the existence of a fiduciary relationship arising

from the presence of an express or technical trust." *Simmons Capital Advisors, Ltd. v. Bachinski

(In re Bachinski)*, 393 B.R. 522, 532 (Bankr. S.D. Ohio 2008) (quoting *In re Blaszak,* 397 F.3d at

391).

Though federal law governs whether a fiduciary relationship exists, state law governs the

question of whether an express or technical trust exists. *See Long v. Piercy (In re Piercy)*, 21

F.4th 909, 926 (6th Cir. 2021) (citing *In re Blaszak*, 397 F.3d at 391).  "To establish the

existence of an express or technical trust, a creditor must demonstrate '(1) an intent to create a

trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary.'" *In re Bucci*, 493 F.3d at 640

(quoting *In re Blaszak*, 397 F.3d at 391-92).  It is well settled, however, that "a [state] statute

may create a trust for purposes of § 523(a)(4) if that statute defines the trust res, imposes duties

on the trustee, and those duties exist prior to any act of wrongdoing." *In re Bucci,* 493 F.3d at

640, *quoted in In re Piercy*, 21 F. 4th at 927.

In Tennessee, statute requires that a contractor hold monies advanced for payment of

subcontractors in trust. *See* Tenn. Code Ann. § 66-34-304.  As it existed when the Contract was

executed in February 2019, the statute provided the following:

---

[38] A greater "trust" relationship is also required for fraudulent causes of action under state law. *See e.g., State v.
Amanns*, 2 S.W.3d 241, 244 (Tenn. Ct. Crim. App. 1999) ("Simply because a contract exists between two parties does
not mean that a fiduciary relationship has been created as was required for the prosecution under a theory of fraudulent
breach of trust.  In the absence of any statutory authority permitting the same, a court may not impose a fiduciary
relationship between parties to a contract when none exists.").

Any sums received by the contactor as payment for work, services, equipment and materials supplied by the subcontractor, materialman or furnisher for improvements to real property shall be held by the contractor in trust for the benefit and use of such subcontractor, materialman or furnisher and shall be subject to all legal and equitable remedies.

Tenn. Code Ann. § 66-34-304 (2019).[39]

Based on the plain and unambiguous wording of Tennessee Code Annotated section 66-34-304, the Court finds that Plaintiff was a fiduciary as contemplated by the Sixth Circuit and § 523(a)(4). Defendant was required to hold funds received from Plaintiff for the purpose of paying subcontractors (the res) "in trust for the benefit and use of" the subcontractors for whom the funds were being held (the duty that exists before any breach). Tenn. Code Ann. § 66-34-304. The first element of § 523(a)(4) is satisfied.

## 2. Breach of the Fiduciary Relationship

Defalcation, "which may be used to refer to *nonfraudulent* breaches of fiduciary duty," necessarily "includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase[:] . . . one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269, 275 (2013); *see also Weiss v. Fautz (In re Fautz)*, 636 B.R. 553, 571 (Bankr. D. Mass. 2022) ("The meaning of defalcation has at its core the misappropriation of money held in a fiduciary capacity and the failure to account for any such monies. . . . Provided there exists the necessary level or type of intent, risk, or scienter . . . , defalcation encompasses any breach of fiduciary duty that results in a monetary deficiency." (citations omitted)). Nevertheless, Plaintiff is not required to prove bad faith to establish

---

[39] The statute was amended in 2020, and now states the following: "Any sums received by the prime contractor as payment for work, services, equipment, and materials supplied by the remote contractor for improvements to real property must be held by the prime contractor in trust for the benefit and use of the remote contractor, and are subject to all legal and equitable remedies." Tenn. Code Ann. § 66-34-304 (2020).

defalcation; "[i]t is enough to prove that a contractor, in possession of a building contract fund, failed to pay laborers, subcontractors or materialmen, and instead used the fund to pay other debts first, including overhead." *Plasterers Local 67 Pension Trust Fund v. Warrant (In re Warren)*, No. 90-120778, Adv. No. 10-80022, 2011 WL 240409, at *4 (Bankr. W.D. Mich. Jan. 24, 2011) (citing *In re Patel*, 565 F.3d at 969; *Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 257 (6th Cir. 1982)).

The Court concludes that the trial record reflects that Defendant used much of the $140,500.00 paid by or on behalf of Plaintiff either for his own benefit or for other construction projects. By his own testimony, Defendant acknowledged that he did not use the funds for the Project. As detailed above, even giving Defendant the full benefit of the doubt as to his testimony concerning cash expenses for which he has virtually no receipts or records,[40] Defendant has failed to account for more than 25% of the total amount paid by UCIS and Dr. Alouani.

It is also undisputed that Defendant subcontracted with Ahern Rentals, VanhooseCo, and Elk Mountain for rental equipment, pre-cast concrete pipes and related materials, and excavation services on the Project; that Defendant received funds totaling $130,500.00 from the First and Second Draws; and that Defendant did not pay any of those funds – or make any payments at all – to those subcontractors. Although Defendant obtained a cashier's check payable to Elk Mountain for $25,000.00 on April 12, 2019, he did not tender that payment to Elk Mountain and, instead, redeposited the funds into the Pinnacle Account and immediately obtained a cashier's check for $25,000.00 payable to himself.

---

[40] The Court does not intend by reciting Defendant's numbers here to indicate that the Court actually believes Defendant concerning where the cash went. Again, the Court finds Defendant to be wholly lacking in credibility as to his use of the extraordinary amounts of cash he obtained from the Draws.

As this Court very recently explained:

While "[t]he element of defalcation requires proof that the defendant breached a fiduciary duty . . . , not every such breach amounts to defalcation." *Andrade v. Hill (In re Hill)*, 610 B.R. 154, 161 (Bankr. D. Me. 2019). Defalcation under § 523(a)(4) "includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase[:] . . . one involving *knowledge of*, or *gross recklessness* in respect to, the *improper nature* of the relevant fiduciary behavior." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269, 275 (2013) (emphases added); *see also Weiss v. Fautz (In re Fautz)*, 636 B.R. 553, 571 (Bankr. D. Mass. 2022) ("The meaning of defalcation has at its core the misappropriation of money held in a fiduciary capacity and the failure to account for any such monies. . . . *Provided there exists the necessary level or type of intent, risk, or scienter* . . . , defalcation encompasses any breach of fiduciary duty that results in a monetary deficiency." (citations omitted) (emphasis added)).

. . . .

Absent direct evidence of fraudulent intent, the court must determine whether fraudulent intent may be "inferred as a matter of fact" based on a totality of the circumstances when a defendant has engaged in "blameworthy" conduct. *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 759 (Bankr. E.D. Tenn. 2003). "It is well-settled that issues concerning credibility and intent are questions of fact that must be resolved by observing a witness's demeanor and presence on the stand" and a "determination of nondischargeability often comes down to which witnesses are most credible and a debtor's conduct prior to, at the time of, and subsequent to the representations at issue." *Kloeber v. Montanari (In re Montanari)*, No. 12-33189, 2015 WL 603874, at *8 (Bankr. E.D. Tenn. Feb. 12, 2015) (quoting *Hall v. Carter (In re Carter),* No. 13–3094, 2014 WL 4187123, at *4 (Bankr. E.D. Tenn. Aug. 21, 2014) (citations omitted)); *see also Estate of Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921, 926 (7th Cir. 2016) (finding that the bankruptcy court did not err when it based its findings about the debtor's state of mind on circumstantial evidence and drew inferences "based on the objective circumstances, but . . . applied the correct subjective standard"); *Nev. Prop. 1 LLC v. D'Amico* (*In re D'Amico* ), 509 B.R. 550, 557 (S.D. Tex. 2014) ("The debtor's subjective motive to cause harm, however, is a question of fact[.]"); *Ross v. Cecil Cnty. Dep't of Social Servs.,* 878 F. Supp. 2d 606, 621 n.26 (D. Md. 2012) ("Resolution of questions of intent often depends upon the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross examination." (citation omitted)).

"[T]he scienter required for the three offenses described in § 523(a)(4) – fiduciary fraud and defalcation, embezzlement, and larceny – are 'akin,' or closely related, to each other." *Peltier v. Van Loo Fiduciary Servs., LLC (In re Peltier)*, 643 B.R. 349, 360 (B.A.P. 9th Cir. 2022).

*Long v. Piercy (In re Piercy)*, Consol. A.P. No. 3:18-ap-3043-SHB, 2023 WL 2227563, at *5-6
(Bankr. E.D. Tenn. Feb. 24, 2023).

Here, the evidence makes clear that Defendant's lackadaisical approach to his use of cash
and failure to account for funds paid to him for his work on the Project, leaving Plaintiff liable
for $161,734.26 to subcontractors hired by Defendant, constituted the kind of substantial and
unjustifiable risk that Plaintiff would become liable to those subcontractors. *See id.* at *7 (citing
*In re Cupit*, 514 B.R. 42, 52 (Bankr. D. Colo. 2014)).  Defendant presented no evidence to justify
his conduct.  Accordingly, the Court also finds that Defendant's defalcation of his statutory duty
under Tennessee Code Annotated section 66-34-304 constituted at least gross recklessness to
satisfy the second element under § 523(a)(4).

### 3.  Resulting Loss

To successfully prove the third element, the debt must have been incurred as a result of
the defalcation. 11 U.S.C. § 523(a)(4); *In re Garver*, 116 F.3d at 178.  Because defalcation also
includes any embezzlement (i.e, the fraudulent misappropriation of entrusted funds) by
Defendant, any debt owed to Plaintiff "*for* . . . defalcation while acting in a fiduciary capacity[
and] embezzlement" is nondischargeable. 11 U.S.C. 523(a)(4) (emphasis added).

Here, Plaintiff proved that the debt owed to it as a result of Defendant's conduct was
solely because of Defendant's defalcation.  After dissipating the $140,500.00 he had received for
the Project, Defendant abandoned the Project without paying anything to the subcontractors,
leaving Plaintiff with an unfilled hole and a Site that needed repair before any work on a
community center could proceed.

As such, Plaintiff was required not only to pay $83,000.00 in settlement with Ahern
Rentals, VanhooseCo, and Elk Mountain's to obtain releases of their respective liens, but it was

also required to hire a new contractor to repair the damage to the Site and finish building the

community center, not including the attorneys' fees Plaintiff expended to proceed against

Defendant in the State Lawsuit and this adversary proceeding.  Accordingly, there is a clear

resulting loss incurred by Plaintiff, thus satisfying the third element, and the judgment to be

entered against Defendant would be nondischargeable under § 523(a)(4).[41]

## C.  Plaintiff's Entitlement to a Monetary Judgment

Bankruptcy courts are authorized "to adjudicate the validity of a claim and award

damages, 'inclusive of compensatory and punitive damages, costs, interest, and attorney's

fees[,]'" *Lansden v. Jones (In re Jones)*, 585 B.R. 465, 515 (Bankr. E.D. Tenn. 2018) (citations

omitted), and the parties herein expressly consented to entry of a final judgment of this adversary

proceeding by this Court.  Although this action is governed by federal law, the appropriate

measure of damages is accessed under state law. *Haney v. Copeland (In re Copeland)*, 291 B.R.

740, 792 (Bankr. E.D. Tenn. 2003).  Plaintiff seeks a judgment against Defendant for the

amounts paid to Defendant that were to have been used for the Project, damages resulting from

Defendant's breach of contract, and the attorneys' fees and expenses it incurred to prosecute this

adversary proceeding as authorized under the Contract and Tennessee law.

## i.  Damages for Breach of the Contract

"In a breach of contract action, claimants must prove the existence of a valid and

enforceable contract, a deficiency in the performance amounting to a breach, and damages

caused by the breach[,]" *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011).  "[T]he

---

[41] In addition to the finding that Defendant is not entitled to a discharge under § 727(a)(3), because the Court finds that the debt would be nondischargeable under subsection (a)(4), it is unnecessary to address nondischargeability under subsections (a)(2) and (a)(6).  *See, e.g., Marchitello v. Gutierrez (In re Gutierrez)*, 636 B.R. 624, 636 (Bankr. W.D. Pa. 2022) (declining to address the arguments made under the other subsections of § 727 and as to § 523(a) after denying the debtor's discharge under § 727(a)(4)(A)); *Mex. Constr. & Paving v. Thompson (In re Thompson)*, 511 B.R. 20, 29 (Bankr. D. Conn. 2014) (declining to address arguments under additional subsections of § 523(a) after ruling on nondischargeability under § 523(a)(2)(A)).

choice of the proper measure of damages is a question of law to be decided by the court[,]'" *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 228 (Tenn. Ct. App. 2006) (quoting *Beaty v. McGraw,* 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998)), and the plaintiff bears the burden of proving damages by a preponderance of the evidence. *Harper v. Dixon*, No. E2015-00411-COA-R3-CV, 2016 WL 2954311, at *5 (Tenn. Ct. App. May 16, 2016) (citations omitted). "The purpose of assessing damages in breach of contract cases is to place the plaintiff as nearly as possible in the same position [it] would have been in had the contract been performed, but the nonbreaching party is not to be put in any better position by recovery of damages for the breach of contract than he would have been if the contract had been fully performed." *Cantrell v. Knox Cnty. Bd. of Educ.*, 53 S.W.3d 659, 662 (Tenn. 2001) (emphasis removed) (quoting *Lamons v. Chamberlain*, 909 S.W.2d 795, 801 (Tenn. Ct. App. 1993)).

In lawsuits involving the breach of construction contracts,

Tennessee courts have adopted two possible methods of measuring damages: (1) the cost of repair to correct defects and complete the work or (2) the diminution in value of the property from what it would have been worth if the work had been performed in accordance with the contract to what the property is worth with the construction as actually performed. *See GSB Contractors, Inc. v. Hess,* 179 S.W.3d 535, 543 (Tenn. Ct. App. 2005); *Buttrey v. Holloway's, Inc.,* No. M2011–01335–COA–R3–CV, 2012 WL 6451802 at *7–8 (Tenn. Ct. App. Dec. 12, 2012). This Court has held that "'[g]*enerally,* the measure of damages will be the cost or repair *unless* the repairs are not feasible or the cost is disproportionate to the diminution in value.'" *GSB Contractors,* 179 S.W.3d at 543 (quoting *Radant v. Earwood,* No. 02A01–9802–CV–00029, 1999 WL 418339 at *8 (Tenn. Ct. App. June 22, 1999)) (emphasis in *GSB Contractors*).

*Harper*, 2016 WL 2954311, at *4.

The amount of damages must be established with reasonable certainty, which is "a flexible standard." *Tennison Bros., Inc. v. Thomas*, 556 S.W.3d 697, 725 (Tenn. Ct. App. 2017) (citing *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 58 (Tenn. Ct. App. 2004)). "Determinations concerning the amount of damages are factually driven. Thus, the

amount of damages to be awarded in a particular case is essentially a fact question." *Hatchel*, 223 S.W.3d at 228 (quoting *Beaty,* 15 S.W.3d at 827).  Additionally, courts "may place whatever weight they choose upon such testimony and may reject it, if they find that it is inconsistent with the facts in the case or otherwise unreasonable." *Cocke Cnty. Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W. 2d 231, 235 (Tenn. 1985) (quoting 31 Am. Jur. 2d Expert and Opinion Evidence § 138 (1967)).

As previously discussed, Plaintiff paid $130,500.00[42] to Defendant during phase one and paid $83,000.00 to Ahern Rentals, VanHooseCo, and Elk Mountain to settle their respective claims and release liens on the Site.  Dr. Kharif testified that Plaintiff also paid $213,612.53 to restore the Site after Defendant left the Project[43] and that it hired Bob Vick & Associates out of Cookeville to finish the Project.  In support of this testimony, Plaintiff tendered as Trial Exhibit 18 statements and copies of checks to Bob Vick & Associates and other contractors and service companies.  Dr. Kharif also testified that the cost for phase one under the Contract was $161,000.00, but Plaintiff had paid a total of $437,112.53 related to phase one based on Defendant's breach of contract, resulting in a difference of $276,112.53.

Defendant argues that he back-loaded overhead and profit into phases two and three of the Contract.  He asserts that the proper measure of damages for breach of the Contract should be the total amount Plaintiff paid to complete the Project less the total Contract price of $550,680.00.  The Court agrees with Defendant.  The Court, however, disagrees with Defendant's position that because Plaintiff did not present evidence of its total costs for the

---

[42] Although Defendant also was paid $10,000.00 by Dr. Alouani, he is not a plaintiff in this action, and no evidence was presented that Plaintiff reimbursed Dr. Alouani.

[43] Defendant failed to controvert either the evidence of payment or the need to correct work that Defendant had performed before abandoning the Project.

Project – because the Project was not complete as of the trial date – Plaintiff should be barred

from recovering damages for breach of the Contract.

In post-trial filings, Plaintiff focused its request for damages on the amount it seeks under

§ 523(a)(2), (4), and (6).  Plaintiff argues that it should be awarded damages related to phase one

of the Contract to be calculated as follows (plus attorneys' fees and expenses):

| | |
|---|---|
| Subcontractor liens paid by Plaintiff | $ 83,000.00 |
| Cost to restore the site before moving to Phase 2 work: | $213,612.53 |
| Amount paid by Plaintiff to Defendant | $140,500.00[44] |
| Less the amount due under the Contract to Defendant for phase one: | $161,000.00 |
| | |
| TOTAL DAMAGES SOUGHT: | $276,112.53 |

Because the Court has sustained Plaintiff's objection to Defendant's discharge, the Court

need not determine damages under § 523(a).[45]  Given that Defendant will be denied a discharge,

the Court must calculate breach-of-contract damages.  The evidence presented at trial by Dr.

Kharif was that the Project was nearly 90% complete and that Plaintiff had incurred costs

totaling approximately $560,000.00 with an expectation that it would cost an additional

approximately $134,000.00 for a total cost nearing $700,000.00 to finish the Project.  He also

testified that Plaintiff had to reduce costs by cutting back on some of the original plans because

of the increased costs and Defendant's breach of the Contract.

The Court finds that Plaintiff should not be penalized for the fact that the Project was not

complete as of the trial of this case.  Plaintiff presented evidence of the anticipated total cost, and

---

[44] The Court disagrees with this component of damages because the last payment (of $10,000.00) was made by Mr. Alouani, not Plaintiff.

[45] Out of an abundance of caution, however, the Court notes that based on its finding that Defendant committed defalcation while acting in a fiduciary capacity, the Court would award nondischargeable damages under § 523(a)(4) of $83,000.00, the amount of debt that resulted when Plaintiff had to pay to correct Defendant's failure to pay the subcontractors as required by Tennessee Code Annotated section 66-34-304, which creates a trust for the benefit of subcontractors.

Defendant did not object that such testimony was speculative. Evidence of the final Project cost for purposes of calculating damages for Defendant's breach of the Contract was not available as of the trial date. The court finds it appropriate under Federal Rule of Civil Procedure 59(a)(2) and (d), made applicable here by Federal Rule of Bankruptcy Procedure 9023,[46] to allow Plaintiff to supplement the record with final Project cost information and Defendant to respond or challenge the supplemental evidence from which the Court will compute the total damages for Defendant's breach of the Contract. Accordingly, the Court will set a status hearing to allow the parties to suggest the best procedure for supplementing the record on the issue of Plaintiff's costs for the Project for purposes of determining appropriate and complete damages for Defendant's breach of the Contract.

### ii. Attorneys' Fees

Plaintiff also seeks its attorneys' fees and expenses, asserting three bases for such a recovery. First, the Contract expressly provides for indemnification of all expenses, including attorneys' fees, that arise out of the Contract. Second, Defendant operated as an unlicensed contractor in violation of Tennessee Code Annotated section 62-6-103 (because his contractor's license expired during the course of the Project). Third, Tennessee Code Annotated section 66-11-138 authorizes attorneys' fees in cases of embezzlement. "Tennessee is among the majority of jurisdictions following the 'American rule,' which provides that a party to a civil suit may not recover attorney's fees unless there is either a contractual or statutory provision specifically allowing attorney's fees or some other recognized exception to the rule applies." *In re Jones*, 585 B.R. at 518 (quoting *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 212 (Tenn. 2012)

---

[46] Rule 59(d) authorizes the Court, on its own, to "order a new trial for any reason that would justify granting one on a party's motion." After a nonjury trial, the Court may grant a party's motion for a new trial and "take additional testimony" under Rule 59(a)(2).

(citing *Cracker Barrel Old Country Store v. Epperson*, 284 S.W.3d 303, 309 (Tenn. 2009))).

Because Plaintiff is entitled to its attorneys' fees under the Contract, which was drafted primarily

by Defendant and which Defendant does not dispute, the judgment will include Plaintiff's

attorneys' fees and expenses incurred as a result of Defendant's breach thereof.[47]

As it relates to payment of attorneys' fees and expenses, the Contract expressly states the

following:

> 11. INDEMNIFICATION. With the exception that this Section shall not be construed to require indemnification by HCC Contractors to a greater extent than permitted under the public policy of the State of Tennessee, HCC Contractors may agree to indemnify The Upper Cumberland Islamic Society against, hold it harmless from and defend The Upper Cumberland Islamic Society from all claims, loss, liability, and expense, including actual attorneys' fees, arising out of or in connection with HCC Contractor's Services performed under this Contract. This indemnity shall be provided even if The Upper Cumberland Islamic Society is partly responsible for the claim, damage, injury or loss, but HCC Contractors shall not provide indemnity against claims or losses deemed to be caused by the negligence, willful misconduct, or breach of contract of The Upper Cumberland Islamic Society of [*sic*] The Upper Cumberland Islamic Society's agents or employees.

[Tr. Ex. 1 at ¶ 11.]  Defendant did not complete the Project as contracted, and it is undisputed

that he was in material breach of and in default under the Contract because he failed to "deliver

the Services in the time and manner provided for" in the Contract. [Tr. Ex. 1 at ¶ 16.d.]  Clearly,

this adversary proceeding "aris[es] out of or in connection with" Defendant's failure to perform

as required under the Contract.

Defendant has not disputed that the Contract provides for an award of attorneys' fees.

Thus, Plaintiff is entitled to recovery of fees paid to Hodges, Doughty & Carson, P.C. for the

filing and prosecution of the State Lawsuit and this adversary proceeding.  As of October 29,

---

[47] Because Plaintiff is entitled to attorneys' fees under the Contract, the Court need not address Plaintiff's arguments that it is entitled to attorneys' fees under Tennessee Code Annotated sections 62-6-103 and -136 and/or 66-11-138(a)(1); however, attorneys' fees are clearly provided for under both statutes.

2021, Plaintiff had incurred attorneys' fees and expenses totaling $77,138.81, which included

$32,397.50 for the State Lawsuit and $44,741.31 for this adversary proceeding.  Because

Plaintiff has incurred additional attorneys' fees and expenses since October 29, 2021, and will

continue to accrue additional attorneys' fees and expenses for supplementation of the record as

referenced above, once the record is again closed, the Court will direct Plaintiff to file as a late-

filed exhibit an affidavit setting forth the amount of attorneys' fees and expenses it has incurred

since October 29, 2021.  After this affidavit is filed and Defendant has an opportunity to object,

the Court will issue a final judgment with the appropriate monetary amounts.

## II.  CONCLUSION

For the foregoing reasons, Plaintiff is entitled to a judgment against Defendant in an

amount to be fully determined after supplementation of the record concerning Plaintiff's breach-

of-contract damages and attorneys' fees and expenses.  After calculation of damages for breach

of the Contract and Plaintiff's total attorneys' fees and expenses, a Judgment consistent with this

Memorandum will be entered.  Because Defendant failed to keep and preserve appropriate

records from which his financial condition and business transactions could be reasonably

ascertained and to justify this failure to do so under the circumstances of this case, Defendant is

denied a discharge pursuant to 11 U.S.C. § 727(a)(3).

FILED:  March 30, 2023

BY THE COURT

*s/ Suzanne H. Bauknight*

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE